UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| TRENT HAVERKAMP and TRAVIS BLAIR, individually and on behalf of those similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 4:16-cv-00004-RLY-TAB |
| v. | ) ) | |
| STAR OF AMERICA, LLC, | ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANT'S BRIEF IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, Star of America, LLC ("Star of America"), by counsel, pursuant to Fed.R.Civ.P. Rule 56, hereby submits its Brief in Support of its Motion for Summary Judgment.

**I.**

**INTRODUCTION**

Plaintiffs, two Star of America drivers, Travis Blair ("Blair") and Trent Haverkamp ("Haverkamp"), brought this putative collective action, claiming they were deprived of overtime pay owed under the Fair Labor Standards Act ("FLSA"). Their claims fail as a matter of law. Defendant has no obligation to provide Blair and Haverkamp with overtime pay, because there can be no question that they are exempt from that requirement under the Motor Carrier Act exemption ("Motor Carrier Exemption") to the FLSA, 29 U.S.C. § 213(b)(1). Indeed, the airport shuttle route these drivers operated between West Lafayette, Indiana and the Indianapolis International Airport was, as a matter of law, part of a "practical

continuity of movement" between Purdue University and the far flung origins and/or destinations of the passengers utilizing Star of America's shuttle services. As a result, summary judgment in Star of America's favor is appropriate.

## II.

## BACKGROUND

Star of America is a federally authorized for-hire provider of passenger transportation. *Shickles Decl.*, ¶ 2. At all times relevant to this lawsuit it has maintained its assigned DOT number and observed the DOT's Federal Motor Carrier Safety Regulations ("FMCSRs") with respect to all drivers and other applicable employees. *Id.* at ¶ 3. Similarly, the DOT has conducted regular compliance audits of driver files kept by Star of America. *Id.* at ¶ 4. Star of America provides two types of services: (1) charter services, which cross state lines, from which it derives the majority of its revenue; and (2) shuttle services, which do not cross Indiana's borders. *Id.* at ¶ 5. This case concerns Star of America's shuttle services.

## A.

## The Shuttle Services

Star of America offers, on a set schedule, shuttle services between West Lafayette, Indiana and the Indianapolis International Airport (the "Airport") and Bloomington, Indiana and the Airport (the "Shuttle Services"). *Id.* at ¶ 6. For instance, on its early morning "Depart Lafayette/Purdue to Indianapolis Airport" schedule, it leaves Folletts Purdue West, Tarkington Hall, Memorial Union, and the Courtyard by Marriott at 4:20, 4:25, 4:35, and 4:55 a.m., respectively and

2

arrives at the Airport at 6:10 a.m.  *Id.* at ¶ 7, Ex. A.  At the Airport, the shuttle drops passengers at the Airport's Ground Transportation Center.  *Id.* at ¶ 9.  The drivers also pick up passengers from the Airport's Ground Transportation Center and depart to either Bloomington or Lafayette.  *Id.*  On the shuttle's early morning run from the Airport back to Lafayette/Purdue, it departs the Airport at 6:20 a.m. and drops passengers at the Courtyard by Marriott, Memorial Union, Tarkington Hall, and Folletts Purdue West at 7:35, 8:00, 8:05, and 8:10 a.m., respectively.  *Id.* at ¶ 7, Ex. A.  Throughout the day, the shuttle runs between these 4 Lafayette/Purdue locations and the Airport continuously until its last Lafayette/Purdue drop-off at 12:10 a.m.  It makes no other stops.  *Id.*

The shuttle has similar set routes in Bloomington, Indiana.  *Id.* at ¶ 8, Ex. B.  Both the Lafayette/Purdue routes and the Bloomington/Indiana University routes run from approximately 4 a.m. to 12 a.m.  *Id.* at ¶¶ 7-8, Exs. A-B.  Both Purdue University and Indiana University advertise the Shuttle Services as an option for transport to and from the Airport and college students make up the majority of Star of America's customers for the Shuttle Services.  *Id.* at ¶ 11.  Indiana University's Office of International Services specifically identifies Star of America airport shuttles as "[t]he easiest way to get from the Indianapolis International Airport to the Bloomington campus."  *Id.* at ¶ 12, Ex. C.  And, international students' use of the Shuttle Services is clear from the numbers.  Between 2013 and 2016, a total of 6,373 people who purchased the Shuttle Services had billing addresses from countries other than the United States.  *Id.* at ¶ 13.

The majority of passengers seeking Shuttle Services purchase their shuttle tickets online through Star of America's website in advance of their travel. *Id.* at ¶ 14. The majority of those passengers have out-of-state billing addresses. *Id.* at ¶ 15. Passengers may also purchase tickets from drivers if spaces are available on a particular scheduled route. *Id.* at ¶ 16. However, Star of America's services are not available on demand like those of a taxi or on-demand ride service such as Lyft or Uber. *Id.* at 17.

The fleet of vehicles Star of America uses to provide Shuttle Services all carry in excess of 8 passengers and have gross vehicle weight ratings in excess of 10,000 pounds. *Id.* at ¶ 18.

## B.

## The Airport

According to data collected by the Federal Aviation Administration and maintained by the Bureau of Transportation Statistics, all commercial passenger flights to or from the Airport, during the relevant time period, cross state lines. *Decl. of E. Ashley Paynter*, ¶¶ 2-6.[1] The Airport contracted with Star of America,

---

[1] This statistical information is admissible under Federal Rule of Evidence 201. *See U.S. v. Gordon*, No. 06 CR 334, 2006 WL 2246952, at *4 (N.D. Ill. Aug. 3, 2006) (taking judicial notice of the Bureau of Transportation Statistics website and the statistics it provides, noting that the "Bureau of Transportation Statistics was established as a statistical agency in 1992" and that "its basic authorizing legislation is the Safe, Accountable, Flexible, Efficient Transportation Equity Act: (SAFETEA-LU) (Pub.L 109-59, Aug. 10, 2005, 119 Stat. 1144)"). These reports further fit into the exception from the hearsay rule set forth in Fed. R. Evid. 803(8). Additionally, these tables show a handful of passengers who flew intra-state, but the tables appear to indicate that these passengers were on exclusively chartered (non-commercial) flights.

permitting Star of America to offer ground transportation services to and from the Airport for individuals arriving at and departing from the Airport.

Specifically, Star of America is a party to a "Scheduled Route Agreement" with the Airport.  *Shickles Decl.*, ¶ 19, Ex. D.  This contract affords Star of America a nonexclusive right to provide transportation services to passengers from the Airport to Lafayette/West Lafayette, IN and to Bloomington, IN.  *Id.*  It prohibits Star of America from conducting "any other business or commercial operation from or on Airport [property]" and explicitly states that Star of America is "not authorized to use the Airport or its Ground Transportation Center as an intercity transfer hub."  *Id.*  In other words, on the Airport's property, Star of America is contractually bound to operate solely as a shuttle for passengers travelling to and departing from the Airport.  *Id.* at ¶ 20.

### C.

### Blair and Haverkamp

Star of America maintains a DOT compliant driver qualification file on both Blair and Haverkamp, who each hold a paid passenger chauffeur's license.  *Id.* at ¶¶ 21-22.  Star of America required Blair and Haverkamp to log their time in compliance with the DOT federal hours of service regulations.  *Id.* at ¶ 23.  Blair and Haverkamp both primarily drove the Lafayette/Purdue route to and from the Airport, transporting passengers to and from the Airport as either the first or last leg of their interstate journey.  *Id.* at ¶ 24.

**D.**

**The Lawsuit**

On January 6, 2016, Haverkamp filed his Complaint and Demand for Jury Trial alleging that Star of America failed to pay its shuttle drivers in accordance with federal overtime wage laws.  ECF No. 1.  On March 2, 2016, Haverkamp filed his Amended Complaint and Demand for Jury Trial, and Blair joined in his claims.  ECF No. 10.  On September 30, 2016, after filing one more amended complaint, Plaintiffs filed the operative complaint, which expands on some of the factual allegations in the prior iterations of the complaint, but still has a lone substantive claim:  Star of America failed to pay its shuttle drivers overtime under the FLSA.  ECF No. 33.  On October 3, 2016, the Court issued an order permitting Star of America to file this dispositive motion to address only the applicability of the Motor Carrier Exemption without prejudice to Star of America's right to file a subsequent dispositive motion raising any issues wholly distinct from those addressed in this motion.   ECF No. 34.

**III.**

**ARGUMENT**

The issue presented to the Court is quite focused.  It must determine whether, as a matter of law, the Motor Carrier Exemption applies to employees performing the Shuttle Services.  This inquiry turns on the question of whether the Shuttle Services are in the "practical continuity of movement" in interstate commerce.  Given the undisputed facts, they must be.  Between 2013 and 2016, no commercial passenger flights departed the Airport for another Indiana

6

destination.  Similarly, no commercial passenger flights arrived at the Airport from another Indiana destination.  The only practical, logical conclusion is that although the shuttle passengers started or ended their trips in Indiana, the rest of their journeys took them beyond Indiana's border by air travel.  Consequently, the Shuttle Services were a continuation of each passenger's interstate journey and are the type of services that fit squarely within the Motor Carrier Exemption. There can be no question that Blair and Haverkamp are exempt from the payment of overtime by virtue of the fact that they were providing the Shuttle Services.

## A.

### **Standard**

Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(a) which provides in relevant part: "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed.  Fed. R. Civ. P. 56(c)(1).  A genuine issue of material fact

exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence. *See Goodman*, 621 F.3d at 654; *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

**B.**

### The Motor Carrier Exemption Applies to Blair and Haverkamp's Work at Star of America

The FLSA establishes a general rule that requires employers to compensate any employee at a rate not less than one and one-half times the regular rate at which he or she is employed for the time worked in excess of 40 hours per week. 29 U.S.C. § 207(a)(1). However, the FLSA provides an exemption to the overtime pay requirement with respect to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of Section 31502 of Title 49." 29 U.S.C. § 213(b)(1).[2]

---

[2] Under Section 31502, the Secretary may "prescribe requirements for . . . qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier." 49 U.S.C. § 31502(b)(1).

"Congress created this Motor Carrier Act exemption to eliminate any conflict between the jurisdiction exercised by the Department of Labor ("DOL") over the FLSA and the mutually exclusive jurisdiction exercised by the Department of Transportation ("DOT") over the [Motor Carrier Act]." *Walters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir. 2009). Accordingly, the application of the exemption is "dependent on whether the secretary has the power to regulate, not on whether the Secretary has actually exercised such power. That is, for the MCA exemption to apply, the Secretary of Transportation's power to regulate under the act *merely needs to cover* a particular group of employees." *Abel v. Southern Shuttle Servs., Inc.*, 631 F.3d 1210, 1213 (11th Cir. 2011) (citations and quotations omitted) (emphasis added).

The Department of Labor ("DOL") regulation implementing the Motor Carrier Exemption explains the statute's requirements:

> The exemption of an employee from the hours provisions of the [FLSA] under section 13(b)(1) depends both on the class to which the employer belongs and on the class of work involved in the employee's job. The power of the Secretary of Transportation to establish maximum hours and qualifications of service of employees, on which the exemption depends, extends to those classes of employees and those only who:
>
> (1) [a]re employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under section 204 of the [MCA];
>
> (2) Engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA].

29 C.F.R. § 782.2.   Appellate courts have structured their application of the Motor Carrier Exemption around these two requirements.   *Benson v. Universal Ambulance Serv., Inc.*, 675 F.2d 783, 785 (6th Cir. 1982); *Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 181-82 (11th Cir. 1991); *Stronger v. Dillon Resources, Inc.*, 618 F.3d 467, 472-76 (5th Cir. 2010); *Walters*, 575 F.3d at 1226. Here, both prongs are met.

**1.**

**Star of America is Unquestionably Subject to the Jurisdiction of the Secretary of Transportation**

There can be no question that Star of America is a motor carrier subject to the Secretary of Transportation's jurisdiction under the Motor Carrier Act. Star of America is licensed by the DOT, possesses the FMCSA authorizations necessary to conduct daily interstate motor carrier operations, requires all of its drivers to comply with DOT safety and hours-of-service regulations, and has been regularly audited by the DOT.   These facts alone demonstrate that the Secretary of Transportation has actually exercised its jurisdictional authority over Star of America.   *See Walters*, 575 F.3d at 1227.

Additionally, the Secretary has jurisdiction over Star of America because its business all occurs in interstate commerce.   Specifically, the Shuttle Services are actually interstate trips even though they do not cross state lines as they are one component of the interstate movement of commercial air passengers travelling either to or from Indiana in interstate commerce.   Moreover, a substantial portion of Star of America's business is derived from charter shuttle

services which occasionally cross state lines.  *Cf. Morris v. McComb*, 332 U.S. 422 (1947) (holding that the Secretary had jurisdiction over a motor carrier whose trips in interstate commerce represented only 3% to 4% of the carrier's overall business).

## 2.

### Blair and Haverkamp are Engaged in Activities Affecting the Safety of Vehicles Transporting Passengers in Interstate Commerce

As drivers, Haverkamp's and Blair's work directly affected the safety of operation of motor vehicles in the transportation of passengers on public highways.  *See* 29 C.F.R. § 782.2(b)(1) (a driver is an occupation that directly effects the safety of motor vehicles).

Whether the Shuttle Services consisted of transporting passengers in interstate commerce even though they never crossed state lines is an issue of first impression in the Seventh Circuit.  Courts are guided by "practical considerations" when determining whether an employee's activities would be part of interstate commerce.  *See Marshall v. Victoria Transp. Co., Inc.*, 603 F.2d 1122, 1123 (5th Cir. 1979) (local city bus route was in "interstate commerce" when the drivers' regular duties involved transportation of Mexicans who had walked across a nearby border).  A trip need not cross state lines in order to be part of interstate commerce.  Instead, it must be part of a "continuous stream of interstate travel," which requires a "practical continuity of movement" between the intrastate segment of travel and the overall interstate flow.  *See Walters*, 575 F.3d at 1229 (citations omitted); *Abel*, 631 F.3d at 1215; *Marshall*, 603 F.2d at

11

1125; *U.S. v. Capital Transit Co.*, 338 U.S. 286, 288-90 (1949) (local District of Columbia bus route was in "interstate commerce" when drivers' regular duties, which occurred exclusively in the District, involved transportation of passengers to locations to board Virginia-bound buses).   Determining whether Plaintiffs' activities are in "practical continuity" with their passengers' interstate moves necessarily calls for a pragmatic analysis.   Such an analysis here establishes that Blair and Haverkamp were transporting passengers in interstate commerce for the purpose of the Motor Carrier Exemption, even if they did not cross state lines in the course of providing the Shuttle Services.

In the context of the carriage of freight, trips within a single state are considered to be "interstate" if the shipper has a "fixed and persisting intent" that the goods be part of a practical continuity in the flow of interstate commerce. *See Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943); *Alice v. GCS, Inc.*, 2006 WL 2644958, at *1 (N.D. Ill. Sept. 14, 2006) ("Crucial to a determination of the essential character of the shipment is the shipper's fixed and persisting intent at the time of shipment.").   Courts have distinguished the passenger context from the freight context, looking instead to other indicia of whether the passenger's in-state trip is a continuation of his or her interstate move, or if it is separate from the interstate portion of his or her travel.   *See Packard v. Pittsburgh Transp., Co.*, 418 F.3d 246 (3d Cir. 2005).

Whether set-route, contractually exclusive airport services are the type of work captured by the Motor Carrier Exemption is an issue of first impression in the Seventh Circuit.   Indeed, Star of America was unable to locate any case

12

examining the Motor Carrier Exemption that is factually on all fours with this one. Indeed, the most factually analogous case to this one occurred in the context of the Supreme Court's analysis of the Interstate Commerce Commission's (predecessor to the Department of Transportation) jurisdiction in *U.S. v. Capital Transit Co.*, 325 U.S. 357 (1945), upheld at 338 U.S. 286 (1949).

In that case, the Interstate Commerce Commission sought to regulate certain bus and street car rates for travel exclusively within the boundaries of the District of Columbia. The travel at issue consisted of "thousands of Government employees living in the District [who] boarded [Defendants'] streetcars near their residences, rode to the District's business area, and there transferred to one of the Virginia buses for carriage to the nearby Virginia establishments." 338 U.S. at 288. The Court had upheld a Commission order fixing a through fare for the entire trip between the District residential area and the Virginia government installations. *Id.* However, Defendant had argued that because bus and streetcar transportation between the District's residential and business areas was wholly within the District, it could not be treated as part of an "interstate movement" and, therefore, was not subject to the jurisdiction of the Commission, noting the Motor Carrier Act exempted "intrastate transportation" of motor carriers from Commission regulation. *Id.* The Supreme Court disagreed, holding that the interstate journey of the government employees "actually began at the time they boarded a Transit bus or streetcar near their home, and actually ended when they alighted from the Virginia going bus at their place of work." 325 U.S. at 365.

Considering the undisputed facts of this case, the common-sense solution is clear.  Passengers travelling through the Airport on their way out-of-state or back to Lafayette/Purdue were indisputably engaged in an interstate trip.  That interstate trip was not complete until the passengers arrived at their final destination – either out of state or back in Lafayette/Purdue.  Even the locations in Lafayette where shuttle drivers picked up and dropped off passengers are telling as to the interstate nature of these passengers' instate travel.  The majority are on or just off of Purdue's (a major research university) campus.  The remaining location – Courtyard by Marriott is a hotel.  The shuttle trip was part and parcel to the passengers' interstate travel, even if it occurred entirely within Indiana's borders.  Just as the government employees' intra-District travel was part and parcel to their interstate commute to work, so to is Star of America's intra-Indiana travel part of their *interstate* journeys.  *See Capital Transit Co.*, 325, U.S. at 365.  Standing alone and guided by practical considerations as contemplated in *Marshall,* these facts are sufficient for the Court to determine that the driving activities that Blair and Haverkamp performed while employed by Star of America are part of interstate commerce and the Motor Carrier Exemption applies and bars their overtime claim.

Even though the lens of the handful of cases that have grappled with the Motor Carrier Exemption in the passenger context in factually distinct scenarios, the Court's conclusion should remain unchanged.  In *Packard*, the employer provided transportation to elderly and disabled individuals in Allegheny County, Pennsylvania, occasionally including trips to train and bus stations and the

14

airport.  *Id.* at 248-49.  The Third Circuit concluded that this transportation service did not fall within the Secretary's jurisdiction because it was not "in practical continuity with a larger interstate journey."  *Id.* at 258.  In analyzing the interstate nature of the services provided by the defendant, the Third Circuit looked outside the context of the Motor Carrier Exemption, analyzing cases that arose in other contexts, including *United States v. Yellow Cab Co.*, 332 U.S. 218 (1947), a case arising under the Sherman Act.

In *Yellow Cab*, the Supreme Court described interstate commerce as "an *intensely practical concept* drawn from the normal and accepted course of business."  *Id.* at 231 (emphasis added).  Differentiating the "limits of an interstate shipment of goods" from the "commonly accepted limits of an individual's interstate journey," the Court instructed that lower courts must "mark the beginning and end of a particular kind of interstate commerce by its own *practical considerations.*"  *Id.* (emphasis added).  In light of the practical considerations at play, the Supreme Court concluded that "in the absence of some special arrangement," a taxi ride to or from a railroad station is a local trip, not within interstate commerce.  *Id.* at 231-32.  Relying on the analysis in *Yellow Cab*, *Packard* concluded that the transportation at issue involved no special arrangement such as through ticketing or a prior arrangement of "any kind" with "the railroads, airlines, or other companies" and, thus, was purely intrastate in nature.  418 F.3d at 258.

Six years after *Packard* was decided, the Eleventh Circuit analyzed the same issue in *Abel v. Southern Shuttle Services, Inc.*, 631 F.3d 1210 (2011).  In

15

that case, the defendant operated a share-ride airport shuttle which transported passengers to and from three South Florida airports. *Id.* at 1211. Many of the shuttle passengers arranged for shuttle transportation directly, and some made reservations as part of "internet package deals" where a traveler purchased his airfare, hotel, and transportation to and from the airport all together from a third party vendor. *Id.* at 1212. The court concluded that the "purely intrastate transport of passengers to and from an airport may, under certain circumstances, constitute interstate commerce." *Id.* at 1216. The court reasoned that "[m]any of [Defendant's] passengers to and from the airport have either just flown from, or are about to fly to, places outside the state of Florida." *Id.* The existence of a special arrangement between the internet travel companies and the defendant's shuttle services demonstrated that the "package-deal" customers' shuttle trips had a "practical continuity of movement" with their overall interstate journey. *Id.*

Here, the undisputed evidence similarly demonstrates that as a practical matter, the Shuttle Services provided by Blair and Haverkamp are a continuation of the interstate travel of their passengers. All of Star of America's passengers who are transported via the Shuttle Services go to or from the Airport. There are no commercial flights to or from the Airport that came from or travelled to another location within Indiana, during the period relevant to this suit. Blair and Haverkamp's job duties consisted of picking up passengers either at the Airport or at Lafayette/Purdue and transporting those passengers to West Lafayette or the Airport on a set schedule. For each passenger, the shuttle ride

16

is part of the continuous stream of interstate travel that consists of their journey from out of state to a major in-state university or, conversely, from the university to an out-of-state (or even out-of-country) destination. *See Garcia v. Pace Suburban Bus Serv.*, 955 F.Supp. 75, 77 (N.D. Ill. 1996) (stating that two in-state airport shuttles are "in interstate commerce for the purposes of the Secretary of Transportation's authority").

Critically, Star of America operates under a contractual arrangement with the Airport requiring that the Shuttle Services are exclusively to be used by passengers seeking travel to or from the Airport. Star of America's arrangement with the Airport is explicit: Star of America is not to use the Airport as an "intercity hub" and the drivers may not deviate from their regularly scheduled stops. *Shickles Decl.*, ¶¶ 17, 19, Ex. D. As a result, the Shuttle Services are not "just another local fare" for Blair and Haverkamp. *See Packard*, 418 F.3d at 258 (internal quotations omitted). Instead, Blair and Haverkamp are vital links in the chain of interstate travel for their passengers. *See Yellow Cab Co.*, 332 U.S. at 228-32 (1947) (contract or other "special arrangement" must be present to bring local taxi service to/from railroad station into "interstate commerce"), overruled on other grounds by *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984); *Abel*, 631 F.3d at 1217, n.6 (interpreting "special arrangement" broadly). The practical import of these facts is that the Shuttle Services, despite occurring within the borders of Indiana, are part of a stream of interstate commerce. These passengers' interstate journeys would not be complete without the Shuttle Services, which are the most cost-effective method

17

of travel from the Airport to either Bloomington or West Lafayette.  Put simply, Blair and Haverkamp's provision of the Shuttle Services is, for all practical purposes, interstate travel.  Consequently, Blair and Haverkamp are exempt from the payment of overtime under the Motor Carrier Exemption and Star of America is entitled to judgment in its favor.

## IV.

### CONCLUSION

It cannot be reasonably disputed that Star of America is under the jurisdiction of the Secretary of Transportation or that, as drivers, Blair and Haverkamp's job duties directly affected the safety of passenger travel on public highways.  The determinative question in this case is whether Blair and Haverkamp's job duties occurred in interstate commerce.  And, for all practical purposes, they did.  The constellation of undisputed facts demonstrates that the Shuttle Services provided by Blair and Haverkamp were necessarily part of their passengers' interstate travel.  Accordingly, the Motor Carrier Exemption applies to Blair and Haverkamp's employment with Star of America and their claims must fail as a matter of law.  For all these reasons, Star of America respectfully requests that the Court grant its Motion for Summary Judgment and enter judgment in its favor, dismissing all of Blair and Haverkamp's claims.

Respectfully submitted,


***/s/ Angela S. Cash***
Angela S. Cash
Attorney No.:  18906-10
Christopher J. Eckhart
Attorney No.:  27823-49
E. Ashley Paynter
Attorney No.:  29423-49

Attorneys for Defendant,
Star of America, LLC

Scopelitis Garvin Light Hanson & Feary
10 W. Market Street, Suite 1500
Indianapolis, IN  46204
Phone:  (317) 637-1777
Fax:  (317) 687-2414

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2016, a copy of the foregoing was filed electronically.  Parties may access this filing through the Court's system.

Christopher S. Wolcott
chris@gibbonslegalgroup.com

Philip J. Gibbons, Jr.
phil@gibbonslegalgroup.com


***/s/ Angela S. Cash***
Angela S. Cash

4845-3840-4413, v. 4

19